765 F.2d 147
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE,
v.
HUGH F. KENT, DEFENDANT-APPELLANT.
 NO. 84-5821
 United States Court of Appeals, Sixth Circuit.
 5/23/85
 
 Appeal from the United States District Court for the Eastern District of Tennessee, Northeastern Division
 Before: KEITH and KRUPANSKY, Circuit Judges, and COHN, District Judge.*
 PER CURIAM:
 
 
 1
 The defendant Hugh F. Kent appeals from his jury conviction of possession of a stolen truck tractor in violation of 18 U.S.C. Sec. 659 and concealment of the truck tractor in violation of 18 U.S.C. Sec. 2313. The jury acquitted defendant of transporting the truck tractor in violation of 18 U.S.C. Sec. 2312 and Sec. 2 and its trailer in violation of 18 U.S.C. Sec. 2314 and Sec. 2. Defendant claims the district court erred in admitting over objection testimony about statements made by defendant regarding buying stolen furniture and stealing loaded trucks from his employer. For the reasons which follow, we affirm the convictions.
 
 I.
 A.
 
 2
 Early in the morning of January 2, 1984, a 1978 White Freightliner truck tractor pulling a 1977 Fruehauf trailer loaded with furniture was stolen from a truck stop in Wise, North Carolina, where the driver parked it after he became ill.
 
 
 3
 The next day, according to James C. Jennings, who owned and operated a small truck tractor repair business in rural Greene County, Tennessee, defendant and Bill Hashbarger drove into his place of business in the White Freightliner truck tractor. Jennings said that in late December, 1983, defendant had asked him if he was interested in purchasing a 400 Cummings engine. Thinking the White Freightliner had such an engine defendant offered to sell it to Jennings. After Jennings declined defendant asked permission to park the truck tractor at Jennings' business saying he would return in a few days. Jennings declined to do any work on the truck tractor believing it was stolen.
 
 
 4
 A short time later defendant and Hashbarger took the truck tractor away. A day or so later defendant returned the truck tractor to Jennings' lot and parked it. Jennings noticed its markings and identification had been changed. Jennings kept asking defendant to move the truck tractor. While defendant promised to do so, it remained on Jennings' lot until May, 1984.
 
 
 5
 On May 16, 1984, FBI Agents acting on a tip from a confidential informant found the Fruehauf trailer abandoned at an interstate truck stop in Greene County. Subsequently, they received information that the truck tractor was at Jennings' place of business. They went to Jennings' lot, identified the truck tractor, and questioned Jennings who related what had happened. During the course of the conversation defendant and Hashbarger drove into the lot. The agents identified themselves and told defendant the truck tractor had previously been stolen in North Carolina.
 
 
 6
 Defendant initially denied any knowledge about the truck tractor but later in an interview said he first saw the truck tractor in mid-April when a person by the name of Edwin Pierce offered it to him for sale. He took it for a test drive, he said, with its current markings, eventually leaving it with Jennings for repairs. Hashbarger supported defendant's story.
 
 
 7
 At trial defendant did not testify. Through counsel, in response to a Fed. R. Crim. P. 12.1 motion, he offered as an alibi that he and Hashbarger had been on a road trip on January 3, 1984, through the western United States and provided fuel receipts and related documents to support the alibi. Hashbarger, the only defense witness, testified he and defendant left Tennessee on a western trip on January 2, 1984, and returned on January 7, 1984. This testimony was supported by the documents provided before trial. During cross-examination, Hashbarger denied he had sustained injuries in a fight and had been arrested and jailed on January 1, 1984. On rebuttal the government showed several of the documents were falsified.[1]
 
 
 8
 None of the testimony offered by the government was seriously challenged on cross-examination. The last witness during the government's case-in-chief was Jess June, a polygraph examiner, who testified he conducted a job interview with defendant in mid-February, 1984, in which defendant made the incriminating statements he contends were erroneously admitted.[2] The questions and answers were as follows:
 
 
 9
 'Q. Mr. June . . . directing your attention to the time period between 1983 to the time that you interviewed Mr. Kent on February 9, 1984, what if anything, did Mr. Kent indicate to you was his employment history for that particular time period?
 
 
 10
 A. Hugh Kent Truck Line and Douglas Truck Lines and wildcatted hauling hot freight during that time.
 
 
 11
 Q. . . . did you discuss with him any involvement he had in employee theft?
 
 
 12
 A. Yes, sir.
 
 
 13
 .............................................................
 
 
 14
 ...................
 
 
 15
 * * *
 
 
 16
 He was interviewed concerning the period of the last three years and in the pretest interviews stated that he has outstacked and outcounted to create overages at one business and does this because the company owes his $28,000. He would steal one of their loaded trailers, if could. Grocery shop from the trucks knowing that he would be short and have to pay.
 
 
 17
 Q. Mr. June . . . did you have any discussion with Mr. Kent as to any knowledge he might have that would have occurred between January 1 of 1984, and the date of your interview on February 9th of 1984 as it relates to furniture?
 
 
 18
 .............................................................
 
 
 19
 ...................
 
 
 20
 * * *
 
 
 21
 A. We discussed unsolved crimes for a period of the last seven years and his statements in regard to that was in 1984 he bought stolen furniture for $1,500, buys fuel for 50 cents a gallon from company drivers and tells drivers to do the same. Also tires, and tells drivers to do the same.
 
 
 22
 Q. Finally, Mr. June, during the course of your interview with Mr. Kent, did he indicate any additional contact he had with hot loads or merchandise?
 
 
 23
 A. That he runs hot loads and skims about $1,000 a month.' (emphasis added).
 
 B.
 
 24
 Defendant repeatedly objected to June's testimony. While there is some indication on the record of a bench conference before June testified, there is nothing on the record to suggest the district court considered June's testimony in advance either through a voir dire or offer of proof, or made any ruling on its admissibility other than the following colloquy with the Assistant United States Attorney immediately following June's first statement:
 
 
 25
 The Court: Are we going to be on this case now?
 
 
 26
 Mr. Blackwell: No, only have . . .
 
 
 27
 The Court: We don't want to have to try it again.
 
 
 28
 Mr. Blackwell: I understand.
 
 
 29
 The Court: All right. Go ahead.
 
 
 30
 Mr. Blackwell: I think this is very relevant and I think the witness should answer the questions.'
 
 
 31
 Still later in June's testimony the district court said, 'I guess, I assume it is going to have something to do with this.'
 
 II.
 A.
 
 32
 Defendant argues on appeal that the district court committed reversible error in allowing June to testify as he did regarding defendant's bad character and prior bad acts when character was never an issue in the case. Defendant contends the district court, before admitting the extrinsic evidence offered through June's testimony, should have first determined that it was relevant to an issue other than defendant's character and then gone on to determine that its probative value was not sub-- stantially outweighed by its prejudice to defendant. Nowhere in his brief does defendant say how he was substantially prejudiced by June's testimony nor, more importantly, how the jury was influenced by it.
 
 B.
 
 33
 The government does not discuss whether there was any prejudice to defendant by the admission of June's testimony. The government first contends that June's testimony was admissible as an admission on defendant's part under Fed. R. Evid. 801(d)(2)(A),[3] and then argues it was relevant to show intent and knowledge under Fed. R. Evid. 404(b), that is to show that defendant, who acknowledged possession of the truck tractor, knew that it was stolen. Intent and knowledge are essential elements of the crimes charged, says the government, and it was not required to wait and see whether defendant would argue the non-existence of any particular element of the crimes charged before introducing evidence establishing that element. See United States v. Hamilton, 684 F.2d 380, 384 (6th Cir.), cert. den. 459 U.S. 976 (1982).
 
 III.
 A.
 
 34
 Disposition of this appeal is governed by this circuit's latest exposition on Fed. R. Evid. 404(b) in United States v. Ismail, No. 84-1489, ---- F.2d ----, (Decided and Filed March 18, 1985).
 
 
 35
 In Ismail the defendant was charged with drug trafficking after a shipment of drugs was discovered in April, 1983, which was linked to him. Defendant denied any connection with the shipment. At trial, defendant's son testified that on various occasions when defendant visited him from 1977 to 1979, he was involved in drug transactions. On appeal, defendant argued that his son's testimony was erroneously admitted under Fed. R. Evid. 404(b).
 
 
 36
 In upholding the admissibility of the son's testimony, a panel of this court said:
 
 
 37
 Before admitting prior acts evidence, the district court must determine that the evidence is admissible for a proper purpose and that the probative value of the evidence outweights its potential prejudicial effects. The district court has broad discretion in balancing probative value against potential prejudicial impact. Furthermore, the prior acts generally must be relevant to a matter at issue and must be substantially similar to, and near in time to, the offense charged in the indictment.
 
 
 38
 slip op. at 10 (citations omitted), and went on to say:
 
 
 39
 Assuming arguendo that the admissibility of the testimony about the cocaine transaction depended upon its relevance to the latter question, we hold that any error in admitting the evidence was harmless. Whether the improper admission of evidence under F.R.E. 404(b) constitutes prejudicial error must be decided on the facts of each case.
 
 
 40
 slip op. at 13.
 
 B.
 
 41
 Here the district court clearly failed to consider June's testimony before admitting it. The district court, before allowing June to testify, should have made a reasoned determination on the relevancy of his testimony on the issues of intent and knowledge, and then should have gone on to determine that its probative value outweighed its potential prejudicial effect.
 
 
 42
 There is a substantial doubt that June's testimony was at all relevant, and if relevant, that its probative value outweighed its potential for prejudice. Defendant's statements introduced through June's testimony were very general. Rather than describing specific bad acts they seemed to suggest only that defendant was a bad person. There is a lack of similarity between what defendant said he customarily did and the crimes charged here. The requirement that the bad acts be substantially contemporaneous in time is also lacking in some instances.
 
 
 43
 However, considering the second prong of the Ismail test, we conclude the error was harmless. An independent examination of the record leads to the inescapable conclusion that the evidence of defendant's guilt was overwhelming. Jennings' testimony directly linked defendant to the stolen truck tractor the day following its disappearance. Defendant implicated himself in his statements to the FBI agents on May 16, 1984. The government went to great lengths at trial to show it was unlikely that Edward Pierce, whom defendant said gave him possession of the truck tractor, had anything to do with it. Lastly, defendant's alibi was demolished by the impeachment of Hashabarger's testimony regarding the western trip.
 
 
 44
 The admission of June's testimony was harmless error.
 
 
 45
 The judgment of the district court on the jury convictions above described is AFFIRMED.
 
 
 
 *
 The Honorable Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 According to the government's brief, Hashbarger was subsequently indicted for and convicted of perjury as a result of his testimony. 18 U.S.C. Sec. 1621
 
 
 [2]
 The jury knew nothing of June's role as a polygraph examiner. Nowhere is the reason for the interview described. The testimony objected to is a classic example of evidentiary overkill
 
 
 [3]
 This is irrelevant. Fed. R. Evid. 801(d)(2)(A) says that statements by a party to a litigation are not hearsay. Defendant does not contend the statements objected to were hearsay; he only argues they were irrelevant to any issue in the case and were more prejudicial than probative